UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LISA LANHAM,

          Plaintiff,

v.                                              Case No.  8:13-cv-1251-T-24 MAP

TOM KNIGHT, in his official capacity
as Sheriff of the Sarasota County
Sheriff's Office in and for Sarasota
County, Florida,

          Defendants.
_____/

## ORDER

      This cause comes before the Court on Defendant's Motion for Summary Judgment.

(Doc. No. 14).  Plaintiff opposes the motion.  (Doc. No. 36).  As explained below, the motion is

granted.

## I.  Standard of Review

      Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The Court must draw all inferences from the evidence in the light most favorable to the

non-movant and resolve all reasonable doubts in that party's favor.  See Porter v. Ray, 461 F.3d

1315, 1320 (11th Cir. 2006)(citation omitted).  The moving party bears the initial burden of

showing the Court, by reference to materials on file, that there are no genuine issues of material

fact that should be decided at trial.  See id. (citation omitted).  When a moving party has

discharged its burden, the non-moving party must then go beyond the pleadings, and by its own

affidavits, or by depositions, answers to interrogatories, and admissions on file, designate

specific facts showing there is a genuine issue for trial.  See id. (citation omitted).

## II.  Background

Plaintiff Lisa Lanham filed this gender discrimination lawsuit against Defendant Sarasota County Sheriff Tom Knight.  Specifically, Plaintiff contends that Defendant discriminated against her when he failed to promote her to the position of Civilian Forensic Supervisor in 2010.  Plaintiff was hired by Defendant in 1996 as a crime scene technician ("CST").  It is undisputed that she is a very skilled CST.

In September of 2005, Plaintiff expressed an interest in becoming a supervisor of the Crime Scene Unit ("CSU").  (Doc. No. 29, ¶ 13; Doc. No. 31-2, p. 49 of 52).  At that time, her immediate supervisor was Sergeant Lewis Wood, and Wood reported to the Lieutenant Supervisor of the CSU, Lieutenant Bruce Whitehead.  (Doc. No. 29, ¶ 2, 13).  In an effort to help Plaintiff reach this goal of becoming a supervisor, Wood and Whitehead placed her in an informal six month supervisory program with the intention of meeting with her at least once a month to discuss her progress.  (Doc. No. 29, ¶ 13-14; Doc. No. 31-2, p. 49 of 52).

From the outset, Plaintiff was told that she needed to project a more positive image and develop better communication and personal bonds with her peers, as well as with the people she encountered on crime scenes.  (Doc. No. 29, ¶ 13).  Whitehead indicated that the most important skill that needed improvement "was her ability to communicate properly in a supervisory capacity, understanding that there is more than one right way to complete assignments and tasks, and giving and earning respect of peers and subordinates."  (Doc. No. 31-2, p. 49 of 52).  Wood thought that Plaintiff had an abrasive personality at times, which would be a detriment to her ability to handle people.  (Doc. No. 36-2, p. 83).  Wood  believed that Plaintiff needed to build

better relationships with her co-workers, because being a supervisor includes being a mentor. (Doc. No. 36-2, p. 78-79).

In October of 2005, Wood and Whitehead began to see improvement in Plaintiff's communication.  (Doc. No. 31-2, p. 49 of 52).  By the end of December of 2005, Wood and Whitehead acknowledged Plaintiff's steady progress toward her goal of developing the skills needed to become a supervisor and that she appeared to be on track for a successful completion of her six month evaluation period.  (Doc. No. 31-2, p. 50 of 52; Doc. No. 29, ¶ 16).

By February of 2006, Wood indicated that Plaintiff had continued to make significant strides towards her goal of becoming a supervisor.  (Doc. No. 31-3, p. 7 of 58).  Her progress continued and was noted by Wood in May of 2006.  (Doc. No. 31-3, p. 7 of 58).  Plaintiff's progress, however, eventually stalled, and her continued difficulty with interpersonal skills became evident.  (Doc. No. 29, ¶ 17).

The downturn began on June 14, 2006, when Plaintiff took a day off from work with short notice due to the death of a close friend.  (Doc. No. 31-3, p. 7 of 58).  Plaintiff was on-call that day and had a trainee working with her, and when Plaintiff was unavailable, Plaintiff's schedule was modified to move her on-call day.  (Doc. No. 31-3, p. 7 of 58).  Plaintiff was upset about having to make up her on-call date, given that her unavailability was due to a funeral, and she expressed her displeasure to Wood.  (Doc. No. 31-3, p. 7 of 58).  Wood found her attitude to be inappropriate for a supervisor-in-training.  (Doc. No. 31-3, p. 7 of 58; Doc. No. 36-2, p. 90).

Additionally, Defendant points to another incident.  Plaintiff left a trainee by herself at a death scene, which Wood found to be unacceptable.  (Doc. No. 31-3, p. 7-8 of 58; Doc. No. 29, ¶ 20).

On June 15, 2006, Wood and Whitehead discussed Plaintiff's supervisory training and determined that certain issues needed to be discussed with Plaintiff in a closed-door counseling session.  (Doc. No. 31-3, p. 7 of 58).  Wood and Whitehead agreed that her skills as a CST were unquestioned, but her interpersonal skills could not be ignored.  (Doc. No. 31-3, p. 7-8 of 58).  They stressed to Plaintiff that both good CST skills and good interpersonal skills are vital attributes for a supervisor.  (Doc. No. 31-3, p. 7-8 of 58).  They told Plaintiff that she appeared to be backsliding in the interpersonal skills that she was supposed to be improving.  (Doc. No. 31-3, p. 8 of 58).

Plaintiff described this meeting as Wood and Whitehead berating and bashing her for two-and-a-half hours, mainly because they did not like her personality.  (Doc. No. 31-1, depo. p. 125-26).  In fact, Plaintiff contends that Wood threatened to punch her in the face during this meeting.  (Doc. No. 31, depo. p. 54; Doc. No. 31-1, depo. p. 137).  After the meeting, Plaintiff declined to participate further in the informal supervisory training program.  (Doc. No. 31-3, p. 8 of 58).

Plaintiff contends that Wood has a bias against women.  In support of this contention, Plaintiff points to the following: First, the CSU was a female-dominated department, and Wood admitted that it would have been nice to have another man around and to be able to "talk man stuff."  (Doc. No. 36-2, depo. p. 86, 95-96).  Second, Wood made disparaging remarks about women, including calling his ex-wife a cunt, stating that a female employee "had been rode hard and put up wet," stating that he was turning female due to all of the estrogen that he was being exposed to, comparing Plaintiff to a vulture, and referring to a female CST as a hypochondriac. (Doc. No. 36-2, depo. p. 52, 58, 93, 95, 102-03; Doc. No. 36-5, p. 29-30).

4

In 2007, Whitehead retired and Wood took Whitehead's position.  (Doc. No. 29, ¶ 1; Doc. No. 31, depo. p. 35).  Sergeant Rhonda DiFranco took Wood's former position as Plaintiff's immediate supervisor.  (Doc. No. 19, ¶ 2; Doc. No. 31, depo. p. 35-36).

Like Wood and Whitehead, DiFranco found Plaintiff's supervisory skills to be lacking.  (Doc. No. 19, ¶ 4).  DiFranco found that Plaintiff had difficulty working with other members of the CSU as a team and that Plaintiff was frequently isolated and appeared unapproachable.  (Doc. No. 19, ¶ 6-7).  DiFranco believed that one of the most important skills of a supervisor is the ability to mentor others and that Plaintiff did not mentor others within the CSU.  (Doc. No. 19, ¶ 8-9).  DiFranco felt that Plaintiff had poor communication skills and lacked empathy towards others.  (Doc. No. 19, ¶ 10).  DiFranco also noted that Plaintiff was involved in numerous conflicts with other members of the CSU.  (Doc. No. 19, ¶ 12).

On October 2, 2009, there was an opening for a CSU supervisor to replace DiFranco.  (Doc. No. 31-4).  The position description lists numerous skills that the supervisor should possess, including "a capacity to lead and direct others, . . . earn respect and cooperation, [and] inspire and motivate others."  (Doc. No. 17, p. 20 of 32).  Additionally, the position description states that "[t]he supervisor serves as a role model" and "resolves work related problems."  (Doc. No. 17, p. 20 of 32).  Plaintiff applied and interviewed for the position.

Major Jeffrey Bell had the responsibility to recommend to Defendant the person to become the supervisor, and other than approving Bell's recommendation, Defendant did not play any role in selecting the new supervisor.  (Doc. No. 17, ¶ 6).  Thus, Bell was the decision-maker regarding the selection of the CSU supervisor, although Wood was involved in the process.  (Doc. No. 17, ¶ 6; Doc. No. 30, ¶ 8).

Bell determined that the supervisor position should be open to both employees and people outside of the Sarasota County Sheriff's Office ("SCSO"). (Doc. No. 17, ¶ 8). Bell stated the following regarding his reason for considering people outside of the SCSO:

> It is my belief in seeking to fill this position that it would be advantageous to have someone from outside the agency. I believed that by opening the position to outside applicants I would increase the chances of finding an applicant with the advanced crime scene laboratory experience I was seeking. I also believed it would be advantageous to have a person outside the unit selected as supervisor because of my knowledge of the many personal conflicts within the members of the unit. Because of those conflicts, I believed that it would be difficult to select one of the current members of the Crime Scene Unit to supervise the other members.

(Doc. No. 17, ¶ 9).

Bell decided to use oral board interviews as part of the selection process. (Doc. No. 17, ¶ 10). On November 5, 2009, Bell, Wood, and three others served as the board interviewing the four candidates, with each candidate being asked the same 15 prepared questions. (Doc. No. 17, ¶ 12). The person that scored the highest during the oral board interviews was Lee Dewey, an outside applicant from the Florida Department of Law Enforcement ("FDLE"). (Doc. No. 17, ¶ 13).

Initially, Bell was reluctant to offer Dewy the position, and Bell asked Human Resources to continue to advertise the position. (Doc. No. 17, ¶ 13; Doc. No. 17, p. 31 of 32). Around this time, Bell spoke with Plaintiff regarding the supervisor position and about her attitude towards Wood. (Doc. No. 31-1, depo. p. 231-33; Doc. No. 36-1, depo. p. 41-42). Plaintiff told Bell that she needed Bell's support and asked for Bell to back her up if there were any issues. (Doc. No. 31-1, depo. p. 231-33).

Bell eventually recommended Dewey for the position, and Defendant approved Bell's

recommendation.  (Doc. No. 17, ¶ 13).  However, at the end of December of 2009, Dewey declined the position.  (Doc. No. 17, ¶ 13).

Plaintiff was the next-highest scoring candidate.  (Doc. No. 17, ¶ 14).  Bell was reluctant to recommend Plaintiff for the position because he had serious reservations regarding her supervisory skills, leadership ability, and conflicts with other members of the CSU.  (Doc. No. 17, ¶ 14; Doc. No. 23, ¶ 8).  The third-highest scoring candidate was Plaintiff's co-worker, Maxine Miller; Bell believed that Plaintiff and Miller did not get along well and that making Miller the supervisor would lead to increased conflict within the CSU.  (Doc. No. 17, ¶ 16).

Bell spoke with Captain Paul Marshall, who was in charge of Human Resources, and Major Kurt Hoffman, who serves as General Counsel to Defendant and also serves as the Administrative Division Commander, whose duties include supervision over Human Resources. (Doc. No. 23, ¶ 1; Doc. No. 36-8, depo. p. 8).  Specifically, Bell asked whether he was required to promote Plaintiff due to her scoring the next highest during the interviews, given that he had serious reservations about her interpersonal skills.  (Doc. No. 23, ¶ 8).  Marshall felt that Plaintiff should be given the position, because she was the next highest scoring candidate.  (Doc. No. 36-8, depo. p. 33).  However, Hoffman advised Bell that he was not required to recommend Plaintiff for the position and that he could open up the position to additional applicants.[1]  (Doc. No. 23, ¶ 9, 12).

Bell ultimately decided to re-advertise the position and accept additional applicants. (Doc. No. 17, ¶ 17).  In January of 2010, Bell attempted to recruit Lynn Ernst from the FDLE for

---

[1]Plaintiff contends that Defendant deviated from its procedures by not simply promoting her, since she scored the next highest.  However, Defendant has identified other instances in which the highest scoring person was not given the position.  (Doc. No. 23, ¶ 14).

the position, because Bell believed it would benefit the CSU to hire a person outside of the SCSO's CSU who had advanced crime laboratory experience.  (Doc. No. 17, ¶ 18; Doc. No. 20, ¶ 3).  After considering the position, Ernst ultimately decided not to apply for it.  (Doc. No. 20, ¶ 5).

Around the same time, Wood informed Bell of another potential candidate for the position, Michael Gorn of the Boston Police Department.  (Doc. No. 17, ¶ 19; Doc. No. 30, ¶ 6-7).  Gorn had visited the SCSO while on vacation in December of 2009, and he had an impressive forensic background.  (Doc. No. 17, ¶ 19; Doc. No. 30, ¶ 6-7).  Wood advised Gorn of the position, and Gorn submitted his resume to Wood, who forwarded it to Bell.  (Doc. No. 17, ¶ 19; Doc. No. 30, ¶ 6-7).

In addition to Gorn, another man applied for the position.  Bell conducted oral board interviews of the two candidates, but the now four-person board was made up of Bell, Wood, and two different interviewers than the last board.  (Doc. No. 17, ¶ 20).  Prior to this second set of board interviews, Wood lobbied for Gorn to another board member.  (Doc. No. 36-3, depo. p. 27-29).

Bell selected Gorn for the position.  Bell stated the following reasons for his decision:

> Based on my consideration of the oral board interviews as well as my knowledge of the candidates, review of their resumes and backgrounds, I decided to select Michael Gorn for the position of Crime Scene Unit Supervisor. I believed Michael Gorn to be the most qualified candidate for the job from all of the seven applicants interviewed by both of the oral boards.[2]  His education exceeded the job description and his laboratory and scientific background were excellent. In addition to many years working as a Criminalist

---

[2]It appears that seven people applied for the position, but only six were interviewed. (Doc. No. 17, ¶ 11, 12).

> attending crime scenes with the Boston Police Department, Michael Gorn had experience working as Lead Scientist for a Forensic Laboratory in the United Kingdom. I was impressed with his master's degree in forensics sciences/criminalistics, laboratory experience, his certifications as a crime scene investigator and his publication of research articles in the Journal of Forensic Identification. I believed Michael Gorn had a unique combination of crime scene and crime laboratory experience that would help advance the SSO Crime Scene Unit. He also had training and teaching experience that would help in fulfilling the mentoring duties of the Crime Scene Unit. In addition, Michael Gorn was from outside the unit and I believed that would be an advantage in addressing the personal conflicts that existed between many of the members in the Crime Scene Unit.
>
> *     *     *
>
> The decision to recommend Michael Gorn . . . was based on the superior background and qualifications of Michael Gorn and the potential to successfully fulfill the job duties and requirements[,] in contrast to my legitimate concerns regarding [Plaintiff's] ability to effectively perform the job.

(Doc. No. 17, ¶ 21-22).

During the background process, Gorn disclosed that he had tried marijuana in 2006 while on a trip to Norway after he had left his employment with the Boston Police Department.[3]  (Doc. No. 17, ¶ 23; Doc. No. 17, p. 32 of 32; Doc. No. 31-4, p. 52 of 59).  The SCSO policy provides that drug use after hire by a law enforcement agency is grounds for disqualification.  (Doc. No. 17, ¶ 23).  Because of Gorn's excellent credentials and background, and because Gorn had been out of the country and not employed by law enforcement when he used the marijuana, Bell sought a waiver of the disqualification from Defendant.  (Doc. No. 17, ¶ 23; Doc. No. 17, p. 32

---

[3]It is unclear whether this occurred in 2005 or 2006; regardless, it is undisputed that it occurred while Gorn was out of the country and not working for U.S. law enforcement.  (Doc. No. 17, ¶ 23; Doc. No. 17, p. 32 of 32; Doc. No. 31-4, p. 52 of 59).  Gorn also indicated that he had used marijuana on one other occasion in 1994, but there is no indication that he had been employed by law enforcement prior to that first use.  (Doc. No. 31-4, p. 52 of 59).  Instead, it appears that he had just graduated from college in 1994.  (Doc. No. 21, ¶ 2).

of 32).  Defendant waived the disqualification, and Gorn was hired as the CSU supervisor in June of 2010.  (Doc. No. 24, ¶ 3; Doc. No. 21, ¶ 1).

Plaintiff points out that during the background process, Gorn disclosed two other things. First, in response to the question of whether he had ever consumed an alcoholic beverage while at work, Gorn responded that a co-worker had brought in a bottle of brandy one Christmas while he was working in England, and they shared a drink at the end of the day.  (Doc. No. 31-4, p. 49 of 59).  Second, in response to the question of whether he had ever used someone else's prescription drug, Gorn responded that he had used his wife's prescription drug when his had run out and he had not yet re-filled his.  (Doc. No. 31-4, p. 52 of 59).  However, neither of these two incidents disqualified Gorn from employment with the SCSO.  (Doc. No. 23, ¶ 20).

After Gorn became the CSU supervisor, he reported to Wood.  (Doc. No. 30, ¶ 3).  Gorn went through an initial learning period, which caused Wood some frustration.  (Doc. No. 30, ¶ 11; Doc. No. 36-2, p. 39-43, 56-57).  Wood did not document Gorn's initial problems in his performance evaluation, despite the fact that Wood was supposed to make monthly entries. (Doc. N. 36-2, depo. p. 57-58, 68-69).  However, Gorn eventually got up to speed and Wood became satisfied with Gorn's performance.  (Doc. No. 30, ¶ 11; Doc. No. 36-2, p. 42).

In May of 2012, Plaintiff applied for a position as Evidence Manager.  (Doc. No. 23, ¶ 19).  Captain John Goetluck was the decision-maker regarding the hiring for that position, subject to approval by Defendant.  (Doc. No. 23, ¶ 19).  Goetluck and Hoffman discussed Bell's concerns regarding Plaintiff's poor interpersonal skills, which had caused Bell not to recommend her for the CSU supervisor position.  (Doc. No. 23, ¶ 19).  However, Hoffman advised Goetluck that because the Evidence Manager position involved a different bureau, location, type of work,

and different employees to be supervised, Plaintiff might be able to overcome her interpersonal issues.  (Doc.  No. 23, ¶ 19).  As a result, Goetluck recommended Plaintiff for the Evidence Manager position, which Defendant approved.  (Doc. No. 23, ¶ 19).

In May of 2013, Plaintiff filed the instant lawsuit against Defendant, in which she asserts two claims.  (Doc. No. 1).  In Count I, Plaintiff asserts a gender discrimination claim under the Florida Civil Rights Act ("FCRA") and Title VII due to Defendant's failure to promote her to the position of CSU supervisor.  In Count II, Plaintiff asserts a retaliation claim, alleging that she filed a charge of discrimination regarding the promotion and that she "was retaliated against after she filed her charge in that she was ostracized and denigrated."  (Doc. No. 1).

### III.  Motion for Summary Judgment

Defendant moves for summary judgment as to both of Plaintiff's claims.  With regards to Plaintiff's retaliation claim, Plaintiff does not address Defendant's argument for summary judgment in her opposition brief, nor does she provide any facts or citation to the record to support this claim.[4]  Without such information, it is impossible for the Court to conclude that Plaintiff could establish a prima facie claim of retaliation, as the Court would need to know the date that she filed the claim of discrimination and the date that the retaliatory conduct occurred.  Thus, it appears that Plaintiff concedes that summary judgment is warranted, and the Court grants Defendant's motion for summary judgment as to the retaliation claim.

With respect to Plaintiff's gender discrimination claim, in order to establish a prima facie

---

[4]Plaintiff does not state when she filed the charge of discrimination, when the alleged retaliation occurred, and/or what the retaliatory conduct consisted of.

failure to promote claim, Plaintiff must show four things:[5] (1) she is a member of a protected

class (in this case, a woman); (2) she was qualified for and applied for the promotion; (3) she

was rejected despite her qualifications; and (4) the position remained open or a man was given

the position instead of her.[6]  See Jefferson v. Burger King Corp., 505 Fed. Appx. 830, 833 (11th

Cir. 2013); Summerlin v. M&H Valve Co., 167 Fed. Appx. 93, 94-95 (11th Cir. 2006).  In this

case, Plaintiff has established a prima facie case.  There is no dispute that she was qualified and

applied for the promotion, and she did not get the position.  Additionally, the position remained

open after Dewey declined the position and Plaintiff had received the next highest score.

Furthermore, Gorn, a man, was ultimately given the position instead of Plaintiff.

     Since Plaintiff has established a prima facie case, the burden shifts to Defendant to

articulate a legitimate, non-discriminatory reason for failing to promote Plaintiff to the CSU

supervisor position.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).

In this case, Defendant has stated that the reason for denying Plaintiff the promotion was her

---

[5]Claims of discrimination under the FCRA and Title VII are analyzed under the same framework.  See Giles v. Daytona State College, Inc., 542 Fed. Appx. 869, 872 (11th Cir. 2013)(citation omitted).

[6]If someone outside of Plaintiff's protected class is promoted, "there are 'two conflicting lines of precedent' in the Eleventh Circuit.  Walker v. Mortham, 158 F.3d 1177, 1188 (11th Cir. 1998).  The first line of precedent, which dates back to a 1980 case, Crawford v. Western Elec. Co., Inc., holds that the plaintiff must establish that the position was filled by a person who is not a member of the plaintiff's protected class.  The subsequent line of precedent, first established in Perryman v. Johnson Prods. Co., holds that the plaintiff must establish both that the position was filled by a person who was not a member of the protected class and who possessed equal or lesser qualifications.  Recent decisions by the Eleventh Circuit have followed both lines of precedent."  Fadael v. Palm Beach County School District, 2008 WL 4500700, at *3 (S.D. Fla. Oct. 2, 2008)(internal citations omitted).  This Court adopts the position that a comparison of qualifications is not warranted at the prima facie stage.  See  Summerlin, 167 Fed. Appx. at 95.

inadequate supervisory skills and her history of conflicts within the CSU.  This is a well-documented reason, as Wood, Whitehead, and DiFranco all noted Plaintiff's poor interpersonal skills in her prior evaluations.

Defendant has satisfied its burden, and as a result, the burden of production shifts to Plaintiff to offer evidence that the proffered reason is pretext for discrimination.  See id. Because Defendant's proffered reason is one that might motivate a reasonable employer, Plaintiff must meet it head on and rebut it.  See id. at 1088.  As explained by one court:

> [Plaintiff must] produce sufficient evidence to allow a reasonable finder of fact to conclude that [Defendant's] articulated reasons were not believable.  She could do this by pointing to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proferred [sic] explanation. . . . A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.

Brooks v. County Commission of Jefferson County, Alabama, 446 F.3d 1160, 1163 (11th Cir. 2006)(quotation marks and internal citations omitted).

In support of her contention that Defendant's proffered reason is pretextual, Plaintiff asserts seven arguments.  However, as explained below, none of these arguments have merit.

**A.  Gorn's Qualifications**

First, Plaintiff argues that Defendant cannot rely on Gorn's qualifications as the reason for Bell's decision not to recommend Plaintiff for the promotion, because Bell did not even know that Gorn existed when Dewey had declined the position, Plaintiff was the next highest scoring candidate, and Bell decided not to promote Plaintiff and instead sought out other applicants.  While Defendant relies on Gorn's qualifications as one of the reasons why Gorn was

hired, Defendant does not simply rely on Gorn's qualifications as the reason why Plaintiff was not promoted.  Instead, Defendant states that Plaintiff was not promoted because of her inadequate supervisory skills and her history of conflicts within the CSU.  As such, Plaintiff has not shown that Defendant's proffered reason for failing to promote her is pretextual.

### B.  Bell's Inconsistent Reasons

Second, Plaintiff argues that Defendant's proffered reason is pretextual, because Defendant has given inconsistent reasons for not promoting her.  Specifically, Plaintiff points out that Bell told Marshall and Hoffman that he did not want to recommend Plaintiff for the promotion due to her personality conflicts (Doc. No. 23, ¶ 8), but Bell told Wood that he would not recommend Plaintiff because he wanted someone with more experience and education (Doc. No. 36-2, p. 46).  Both reasons, however, are consistent, because Plaintiff had problems with interpersonal skills, and Gorn had more education and experience.  Thus, these reasons explain why Bell would not recommend Plaintiff and why he did recommend Gorn.  Therefore, Plaintiff has not shown that Defendant's proffered reason for failing to promote her is pretextual.

### C.  Deviation from Hiring Process

Third, Plaintiff argues that Defendant's proffered reason is pretextual, because Bell deviated from the hiring process in two ways: (1) refusing to promote Plaintiff when she became the highest scoring candidate (after Dewey declined the position), and (2) recommending that Gorn be hired despite the fact that he should have been disqualified due to his drug use in 2006 after he had worked for the Boston Police Department.  These deviations, however, do not show pretext.

14

Plaintiff takes issue with the fact that Bell refused to promote her when she became the highest scoring candidate, arguing that Bell deviated from procedures by not automatically promoting her.  However, Defendant has identified other instances in which the highest scoring person was not given the position.  (Doc. No. 23, ¶ 14).  Furthermore, Bell was given a great deal of discretion to determine *who* to select for the position and ***how*** to select that person. (Doc. No. 23, ¶ 2-6, 9, 12).  Bell even sought advice from Human Resources to ensure that his decision did not violate SCSO's policies.  As such, the fact that Plaintiff was the next highest scoring candidate, but was not chosen, does not provide evidence of pretext, given Bell's reason for his decision (and the fact that Plaintiff's poor interpersonal skills have been well documented).

Relatedly, Plaintiff argues that Bell followed the rankings when it supported a male candidate (Dewey, and later, Gorn), but did not follow the rankings when it supported a female candidate (Plaintiff and Miller).  As previously stated, Bell has provided a legitimate, non-discriminatory reason for failing to promote Plaintiff (and also for failing to promote Miller). Bell used the rankings to help him determine who to recommend for the position, but the rankings, alone, were not determinative.  In fact, Bell tried to recruit a female, Lynn Ernst, for the position, but she declined.  As such, Plaintiff has not shown that Bell's failure to adhere to the rankings is evidence of pretext.

Plaintiff also takes issue with the fact that Bell sought a waiver for Gorn's drug use disqualification.  The SCSO's policy on drug use states that drug use after employment by law enforcement is grounds for disqualification from employment.  (Doc. No. 23, p. 25 of 29). However, Defendant has the authority to waive the disqualification, which he did in this case.

15

(Doc. No. 23, ¶ 16-17).  Bell sought and received a waiver of the disqualification because of Gorn's excellent credentials and background, and because Gorn had been out of the country and not employed by law enforcement when he used the marijuana.  (Doc. No. 17, ¶ 23; Doc. No. 17, p. 32 of 32).  As such, the waiver of Gorn's disqualification does not show pretext, given that Plaintiff has not met head on and rebutted the fact that she had poor interpersonal skills, which Bell believed would prevent her from being a good supervisor.

Plaintiff also takes issue with the fact that Wood was initially unsatisfied with Gorn's performance as the CSU supervisor, but Wood did not document his concerns in Gorn's performance evaluation.  While it is undisputed that Wood was initially unsatisfied and did not document this, Wood's dissatisfaction cannot show that Bell's decision not to recommend Plaintiff for the position months earlier was motivated by discriminatory animus.  It merely supports the theory that Wood wanted Gorn to become the supervisor and chose not to document his concerns with Gorn's performance after Gorn got the position.

### D.  Plaintiff's Qualifications

Fourth, Plaintiff argues that Defendant's proffered reason is pretextual, because Gorn was not as qualified for the supervisor position as Plaintiff.  Plaintiff bases this argument on the fact that Gorn was previously a lab analyst, not a CST.  However, Gorn had extensive experience and education.  (Doc. No. 21).  Furthermore, Plaintiff cannot prove pretext simply by arguing that she was more qualified than Gorn; instead, she must show that the disparities between their qualifications "were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen . . . [Gorn] over the plaintiff" for the CSU supervisor position.  See Ash v. Tyson Foods, Inc., 190 Fed. Appx. 924, 927 (11th Cir. 2006)(internal

16

quotation marks and citation omitted).  In this case, it can hardly be said that Plaintiff was so much more qualified than Gorn that it was readily apparent, especially given her well-documented poor interpersonal skills.  "It is not the job of this Court to sit as a super-personnel department that reexamines an entity's business decisions."  <u>Conner v. LaFarge North America, Inc.</u>, 343 Fed. Appx. 537, 542 (11th Cir. 2009)(internal quotation marks and citations omitted).  Therefore, Plaintiff has not shown that Defendant's proffered reason for failing to promote her is pretextual.

### E.  Concern over Conflicts

Fifth, Plaintiff argues that Defendant's proffered reason is pretextual, because a concern over possible conflicts is evidence of gender bias via patronizing conduct.  Specifically, Plaintiff states:

> Wom[e]n can be expected to follow orders from another woman if they are not friends outside of work. Predictions of possible conflicts or jealousies could arise in any department when a candidate is promoted from within. Wood informed Plaintiff she should "joke and smoke" with her fellow female crime scene technicians . . . . A jury can find that Bell and Wood wanted a male to be supervisor.

(Doc. No. 36, p. 15)(internal citation omitted).

Plaintiff's argument misses the point.  Bell's concern over potential conflicts had a basis other than Plaintiff's gender—Plaintiff had previously had issues of conflict with other members of the CSU.  Thus, Bell was not concerned with theoretical conflicts; these conflicts already existed and were documented.  Therefore, Plaintiff has not shown that Defendant's proffered reason for failing to promote her is pretextual.

### F.  Wood's Comments about Women

Sixth, Plaintiff argues that Defendant's proffered reason is pretextual, because Wood has a bias against women.  As evidence of this, Plaintiff points out that the CSU was a female-dominated department, and Wood admitted that it would have been nice to have another man around and to be able to "talk man stuff."  Additionally, Plaintiff points out that Wood made disparaging remarks about women, including calling his ex-wife a cunt, stating that a female employee "had been rode hard and put up wet," stating that he was turning female due to all of the estrogen that he was being exposed to, comparing Plaintiff to a vulture, and referring to a female CST as a hypochondriac.  The relevance of this evidence is questionable, given that Bell, not Wood, was the decision-maker regarding the CSU supervisor position.[7]  Such evidence does not show that Bell's decision to deny Plaintiff the promotion was motivated by discriminatory animus.

Plaintiff also makes a vague argument that Sheila Sullivan, a prior supervisor that reported to Whitehead and Bell, was demoted after she ended a sexual relationship with a captain.  It is unclear how this could show that Bell has a bias against women.  Regardless, such evidence does not show that Bell's decision to deny Plaintiff the promotion was motivated by discriminatory animus.

### G.  Cat's Paw Theory

Seventh, Plaintiff argues that Wood was the real decision-maker under the cat's paw theory, and his comments about women (above) show that the decision not to promote Plaintiff

---

[7]The evidence of Wood's comments about women is relevant to a cat's paw theory of liability, which is discussed in the next section.

was motivated by his discriminatory animus.  A cat's paw situation has been described the following way:

> In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers.   In effect, the harasser *is* the decisionmaker, and the titular "decisionmaker" is a mere conduit for the harasser's discriminatory animus.

Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998)(internal citations omitted).

In Staub v. Proctor Hospital, 131 S. Ct. 1186, 1189 (2011), the Supreme Court addressed "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision."  The Staub case analyzed the issue with respect to a claim under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), but the Court's analysis appears to apply equally to discrimination claims under Title VII.[8]  Sims v. MVM, Inc., 704 F.3d 1327, 1336 n.8 (11th Cir, 2013)(noting that the USERRA statute and Title VII are similar); King v. Volunteers of America, North Alabama, Inc., 502 Fed. Appx. 823, 828 (11th Cir. 2012)(applying Staub).  The Staub Court stated the following regarding the cat's paw theory of liability:

---

[8]The USERRA provides that "[a] person who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership . . . or obligation."  38 U.S.C. § 4311(a).  Furthermore, USERRA provides that "[a]n employer shall be considered to have engaged in [prohibited] actions . . . if the person's membership . . . is a motivating factor in the employer's [decision], unless the employer can prove that the [decision] would have been taken in the absence of such membership."  38 U.S.C. § 4311(c).

An employer's authority to reward, punish, or dismiss is often allocated among multiple agents. The one who makes the ultimate decision does so on the basis of performance assessments by other supervisors. . . . [I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable.  But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified. . . . [I]f the independent investigation relies on facts provided by the biased supervisor—as is necessary in any case of cat's-paw liability—then the employer (either directly or through the ultimate decisionmaker) will have effectively delegated the factfinding portion of the investigation to the biased supervisor. . . . We therefore hold that if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . . .

Id. at 1192-94.

This Court assumes for the purposes of this motion that Plaintiff has shown that Wood is biased against women and, because of that bias, he wanted a man to receive the CSU supervisor position.  However, for the reasons that follow, Plaintiff cannot show that Wood's bias caused Bell not to promote Plaintiff to the CSU supervisor position.

Plaintiff's poor interpersonal skills were documented not only by Wood, but also by Whitehead and DiFranco.  Plaintiff does not argue that their observations and evaluations of her were fabricated in any way.  Instead, she disagrees that the interpersonal qualities that Wood, Whitehead, and DiFranco contend she lacked were actually necessary in order to be an effective supervisor.

With respect to Wood specifically, the documentation of his concerns with Plaintiff occurred in 2005 and 2006, years before the CSU supervisor position became available.  In 2009, after the first round of interviews for the CSU supervisor position, Bell spoke with Plaintiff

regarding the position and about her attitude towards Wood.  Plaintiff did not dispute that conflict did, in fact, exist between her and Wood; if she got the position, she would report directly to Wood.

While Wood appears to have been lobbying for Gorn to receive the position, Bell actually interviewed and considered all of the applicants and made an informed decision about who to choose.  While Bell's decision may have been consistent with what Wood wanted, there is no evidence that Bell's decision was tainted by Wood's alleged discriminatory animus.  Even though Wood documented Plaintiff's poor interpersonal skills, which was a basis for Bell's decision not to promote her, the same evaluations were made by Whitehead and DiFranco, neither of whom is alleged to have held a bias against women.  As such, the Court concludes that Plaintiff has failed to show that Wood was the real decision-maker under the cat's paw theory and that the decision not to promote Plaintiff was motivated by Wood's discriminatory animus.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1)     Defendant's Motion for Summary Judgment (Doc. No. 14) is **GRANTED**.

(2)     The Clerk is directed to enter judgment in favor of Defendant and to close the case.

**DONE AND ORDERED** at Tampa, Florida, this 12th day of August, 2014.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record